# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CRAIG BELL,                    ) | |
|           Plaintiff,        ) | |
|                   ) | |
|     v.                     ) | **CIVIL ACTION** |
|                   ) | **NO. 4:14-40177-TSH** |
| RINCHEM COMPANY, INC.,         ) | |
| CGL TRANSPORT, LLC.,           ) | |
| PAUL BOISVERT, SHANE CANDELARIA, ) | |
| GWEN INMAN, CHRIS WORTHEN,      ) | |
| MATTHEW VAN NORMAN, ANTHONY     ) | |
| WILDER, CHRISTOPHER WORTHEN,    ) | |
| and CHARLES BRIENHOLT,         ) | |
|                   ) | |
|           Defendants.      ) | |

## REPORT AND RECOMMENDATION

### February 11, 2016

Hennessy, M.J.

Currently pending before the court are three separate but related motions to dismiss plaintiff Craig Bell's ("Bell" or "plaintiff") First Amended Complaint for Damages and Injunctive Relief and Demand for Jury Trial (the "Amended Complaint") (Docket #30). Bell seeks redress as a result of the defendants' purported misdeeds relating to Bell's employment with, and eventual termination from, defendant Rinchem Company, Inc. ("Rinchem"). For the reasons set forth below, I recommend that defendants CGL Transportation, LLC and Charles Brienholt's motion (Docket #31), defendants Matthew Van Norman, Anthony Wilder, and Christopher Worthen's motion (Docket #33), and defendants Rinchem, Paul Boisvert, Gwen Inman, and Shane Candelaria's motion (Docket #35) be allowed in part and denied in part.

Factual and Procedural History

The following facts are drawn from the Amended Complaint and are accepted as true for purposes of this motion.  In September 2004, Bell began working as a container specialist and freight handler for Rinchem, which provides chemical and specialty materials warehousing and distribution services (Docket #30 at ¶12).  His duties included signing off on shipments' documentation and acknowledging compliance with all federal, state, and local laws.  Id. at ¶ 20. He was trained to disclose and report any illegalities or improprieties in regulatory compliance. Id. (citing statutes).  At all relevant times, defendant Paul Boisvert ("Boisvert") was Rinchem's Marlborough facility's general manager; defendant Anthony Wilder ("Wilder") was Rinchem's floor supervisor and charged with supervising Bell, and defendant Matthew Van Norman ("Van Norman") was Rinchem's assistant manager.  Id. at ¶ 16.  Plaintiff identifies defendant CGL Transport, LLC ("CGL") as a company "related to," and providing transportation services for, Rinchem,[1] and defendant Charles Brienholt ("Brienholt") as the president and director of both Rinchem and CGL.  Id. at ¶ 17.

On May 24, 2013, plaintiff was alerted by an alarm attached to container load INT1983, a hazardous (diborane) gas shipment set for delivery to New Jersey, and from there to Tel Aviv, Israel.  Id. at ¶¶ 21, 25.  He alleges that the container, which was owned by Rinchem, contained temperature devices that either were not started by another employee, or malfunctioned on a "very hot day."  Id. at ¶ 25.  Because he was not initially assigned to this container, Bell learned of the problem only after being alerted by the container's alarm.  See id. at ¶ 25.  Bell "attended to and looked at temperature gauges on the containers which triggered the alarm."  Id. at ¶ 21.  After Bell

---

[1] In its Answer, Rinchem states that CGL is its wholly-owned subsidiary.  See Docket # 40 at ¶ 17.

addressed the issues in the presence of a second employee named Brett, the container was shipped approximately forty-five minutes after originally scheduled.  See id. at ¶ 25.

Bell maintains that dangerous substance shipments such as Container INT1983 must be accompanied by documentation of "when a container temperature device was started, monitored and departure/arrival time(s)"; without this information, the buyer may refuse the shipment.  See id. at ¶ 26.  He alleges that this "was almost never done as required."  Id.  Instead, Bell's name and signature were—at the direction of Bell's supervisors and without Bell's permission—regularly used by other employees, "thereby exposing plaintiff to liability and misrepresenting his certification and responsibility for any risks" caused by defendants' conduct.  Id.

In June 2013, Bell allegedly learned of "serious and repeated violations" of various laws and guidelines concerning container preparation, temperature and pressure monitoring, hazardous gas transport, employee health and safety, truck placarding requirements, and commercial motor vehicle safety.  See id. at ¶ 22.  He states that "he was confronted by his supervisors seeking his acquiescence in the unlawful practice," and that these individuals "falsely alleg[ed] faulty documentation by plaintiff with respect to the diborane shipment."  See id.

On June 19, 2013, Boisvert, "unfairly and without required due process," issued plaintiff a written warning regarding Container INT1983.  Id. at ¶ 23.  The warning, which was accompanied by a two-day suspension, asserted a swath of allegations of negligence in connection with the diborane shipment.  See id.  Boisvert is alleged to have falsely informed Bell that due to Bell's missteps, the shipment was not accepted in Tel Aviv, resulting in an $80,000.00 loss; according to Bell, this "was not the case and plaintiff later learned they did accept that container."  Id.  Bell further alleges that a Rinchem counseling memo dated June 19, 2013 "falsely stated that 'any further infractions of this kind will result in termination,'" an ultimatum with which he now takes

particular issue because he claims to have previously lodged objections about a range of statutory violations, only to be met with similar threats of termination.  See id. at ¶ 24.

On June 26, 2013, plaintiff began his two-day disciplinary suspension, and upon returning to work sought to revisit "his old and new complaints of safety breaches involving his name."  Id. at ¶ 28.  Instead, he was called into Boisvert's office and forced, at the risk of termination, to sign an employee counseling memo stating that he accepted responsibility for the lack of documentation on the diborane shipment.  Id.  He characterizes this development as defendants falsely blaming him for an incident "that could have resulted in product rejection or worse, potential explosion and/or the creation of an extremely dangerous public health and safety condition."  See id. at ¶ 30. Bell alleges further post-employment retaliation and discrimination by Rinchem in the form of continued blame for the incident, and makes reference to exercising his "rights to free speech as a citizen and under the employers['] grievance and discipline procedures."  See id. at ¶¶ 31-32.

On or about July 1, 2013, Bell discovered written evidence of "potential serious and repeated safety and health violations" related to Rinchem customer DOW Chemical's shipping and transportation documents concerning Rinchem containers.  Id. at ¶ 33.  He notified Wilder and Boisvert of this impropriety and requested an investigation, and alleges that as a result, "he was unfairly disciplined and retaliated against, including termination, by defendants who were unlawfully allowing his name to be signed on hazardous goods shipping documents."  Id. at ¶¶ 33-34.  On July 3, 2013, Bell confronted Boisvert about his perceived retaliation and age discrimination, and threatened to discuss the matter with defendant Shane Candelaria, Rinchem's human resources department, and/or OSHA.  Id. at ¶ 35.  Boisvert responded that if plaintiff reported the matter, he would be fired.  Id.

Plaintiff then filed with human resources and Candelaria a complaint regarding his suspension, defendants' unaddressed safety violations, misrepresentations and forged signatures, threatened retaliation, and age discrimination.  Id. at ¶ 37.  On July 14, 2013 he participated in a telephone hearing with Gwyn Inman of Rinchem's human resources department about these and other matters.  Id. at ¶ 38.  His appeal testimony "was met with disdain and bias" and was denied on July 16, 2013, on which date he was terminated.  Id.  His termination was explained as resulting from a "slowdown in work," which plaintiff now alleges is pretextual.  Id. at ¶¶ 36, 42.  He asserts that he was in fact terminated "in retaliation for engaging in protected employment conduct such as the reporting of his name being signed without his authority . . . and for reasons which were not true, made in bad faith, and were pretext to his termination for whistleblowing, retaliation, age discrimination and wrongful termination."  Id. at ¶ 43. He connects his termination with the "investigative aftermath of the [diborane] gas shipment event(s)," and contends he was fired for good faith communications, disclosures, and complaints of defendants' myriad breaches.  See id. at ¶¶ 44-45.  In October 2013, plaintiff filed a complaint with the MCAD, which was withdrawn in March 2014 in order to file a civil action.  Id. at ¶¶ 47-48.  In November 2013, he gave written notice to the Department of Labor of forgeries on shipping documents as well as related violations. See id. at ¶ 46.

On the strength of these allegations, plaintiff has asserted ten claims against various combinations of defendants: a federal whistleblower action (Count I); retaliation under federal whistleblower statutes (Count II); retaliation under the state whistleblower statute (Count III); wrongful termination (Count IV); federal and state age discrimination and retaliation (Count V); unlawful discrimination and retaliation under Title VII (Count VI); breach of contract and violation of good faith and fair dealing (Count VII); misrepresentation, conspiracy and negligent supervision

(Count VIII); promissory estoppel and breach of implied contract (Count IX); and violations of M.G.L. c. 12 §§11(h)-(i) (Count X).[2]  As noted, three sets of defendants have filed distinct but largely similar motions to dismiss: CGL and Brienholt (Docket #31); Van Norman, Wilder, and Worthen (Docket #33); and Rinchem, Boisvert, Inman, and Candelaria (Docket #35).  Plaintiff has opposed each motion, and each set of defendants has filed a reply.  By order dated May 28, 2015, the Honorable Timothy S. Hillman referred the instant matter to this court for, *inter alia*, dispositive motions.  See Docket #29.

Service of Process

Defendants Van Norton, Wilder, and Norman have sought dismissal pursuant to Fed. R. Civ. P. 12(b)(5) on the ground that plaintiff failed to effect proper service as required by Fed. R. Civ. P. 4(e) and Local Rule 4.1.[3]  A brief review of the relevant procedural history therefore is in order.

Plaintiff initiated this action by filing a complaint on December 3, 2014; as such, per Fed. R. Civ. P. 4(m) and Local Rule 4.1, he was required to serve defendants with copies of the summons and complaint and provide proof of same by April 1, 2015 (*i.e.* 120 days after filing).[4] On March 31, 2015, plaintiff sought to effect service upon Worthen and Van Norman by delivering copies of the summons and complaint to Boisvert at Boisvert's home in Worcester, MA, and filed returns of service on the same day.  See Docket # 7, 8; see also Docket # 30 at ¶ 55.  The next day, plaintiff served Van Norman and Wilder by delivering copies to Susan Griffis ("Griffis") at Rinchem's office in New Mexico, and filed the returns of service on the same day.  Docket # 11,

---

[2] The Amended Complaint improperly labels the final claim as Count IX.

[3] Pursuant to the court's direction at the January 21, 2016 motion hearing, the parties have submitted supplemental briefing on this issue.  See Docket # 73-76.

[4] The 2015 amendment to Fed. R. Civ. P. 4(m) shortened this period from 120 to 90 days.

13.  Plaintiff had served Worthen in the same manner (*i.e.* through Griffis) on March 30, 2015. See Docket # 4-1 at pp. 8-9.

The Amended Complaint states that Boisvert "duly accepted service for all named defendants in this action as the authorized representative to accept such service of process." Docket #30 at ¶ 55.  To this end, the relevant returns of service provide that Boisvert was the "agent, person in charge at the time of service" for Worthen and Van Norman.  See Docket # 7, 8. Similarly, Griffis is identified as being "designated by law to accept service on behalf of" Rinchem. See Docket # 4-1 at pp. 8-9, Docket # 11, 13.

Applicable law

Per Fed. R. Civ. P. 4(e)(1), service of process may be made either by (1) "following state law for serving a summons in an action . . . in the state where the district court is located or where service is made" or (2) doing any of the following: (A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy at the individual's home with someone of suitable age and discretion who resides there; or (C) delivering a copy to an agent authorized by appointment or by law to receive service of process.  The analogous Massachusetts statute (which is relevant because that is where the district court is located and where plaintiff served Boisvert) is substantively identical, see Mass. R. Civ. P. 4(d)(1); the New Mexico statute (which is relevant because that is where plaintiff served Griffis) states, in relevant part, that service upon an individual

> may be made by delivering a copy of the process at the actual place of business or employment of the defendant to the person apparently in charge thereof and by mailing a copy of the summons and complaint by first class mail to the defendant at the defendant's last known mailing address and at the defendant's actual place of business or employment.

NMRA, Rule 1-004(F)(3).  Significantly, this method of service "may be used only when service of process has been attempted, unsuccessfully, in accordance with Rule 1-004(F)(1) and Rule 1-004(F)(2)."  <u>See</u> Committee Commentary to NMRA, Rule 1-004(F)(3).  These provisions discuss, respectively, personal service and service at a defendant's usual place of abode.

Where, as here, a defendant challenges service under Rule 12(b)(5), the plaintiff has the burden of proving proper service.  <u>Rivera–Lopez v. Municipality of Dorado</u>, 979 F.2d 885, 887 (1st Cir. 1992) (citing cases).  If proper service has not been made, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m).  If, however, "the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." <u>Id.</u>  In this context,

> [g]ood cause is likely (but not always) to be found when the plaintiffs failure to complete service in timely fashion is a result of a third person, typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect service or there are understandable mitigating circumstance, or the plaintiff is proceeding pro se or in forma pauperis.

<u>McIsaac v. Ford</u>, 193 F. Supp. 2d 382, 383 (D. Mass. 2002) (quoting Wright & Miller, Federal Practice and Procedure: Civil 3d § 1137, at 342 (2002)).  By contrast, an attorney's "[f]ailure to comply with the clear requirements of Rule 4 is not good cause for failure to serve the complaint in a timely manner." <u>H & A Corp. v. United States</u>, No. 14 Civ. 13783, 2015 WL 5610816, at *4 (D. Mass. Sept. 22, 2015) (citing <u>Riverdale Mills Corp. v. United States Dept. of Transp. Fed. Aviation Admin.</u>, 225 F.R.D. 393, 395 (D. Mass. 2005)).

Even in the absence of good cause, however, a court nonetheless may exercise its discretion to enlarge the time for service.  <u>See</u>, <u>e.g.</u>, <u>Henderson v. United States</u>, 517 U.S. 654, 662 (1996) (citing Advisory Committee Notes that "courts have been accorded discretion to enlarge the 120–

day period 'even if there is no good cause shown.'"); Cruz v. Hampden Cty., No. 95 Civ. 30256, 1998 WL 812398, at *2 (D. Mass. Nov. 6, 1998) (same) (citing cases).  Although the extension of the service window absent good cause has been construed by at least one court as "exceptional" and appropriate "only in circumstances where an extension of time is sought prior to the expiration of Rule 4(m)'s deadline, or where a pro se litigant can show confusion on his part, either because of his unfamiliarity with the rules, or because of his reliance on the misleading advice of others," McIsaac v. Ford, 193 F. Supp. 2d 382, 384 (D. Mass. 2002), such a reading has been criticized as "run[ning] counter to the language of the Advisory Committee notes to the 1993 amendment to Rule 4(m)."  See Crevier v. Town of Spencer, No. 05 Civ. 40184, 2007 WL 120237, at *4 (D. Mass. Jan. 12, 2007) (discussing McIsaac).  Accordingly, I conclude, as did Crevier, that "although Rule 4(m) does not require that plaintiff be granted relief [absent a showing of good cause], the Court has the discretion to do so."  Id.; see also Bunn v. Gleason, 250 F.R.D. 86, 88 (D. Mass. 2008) ("[A] plaintiff may escape dismissal in the face of insufficient service in two circumstances: where there is 'good cause for the failure,' or even if there is no good cause shown, where the court in its discretion decides to grant the plaintiff more time to effect service.") (quoting Fed. R. Civ. P. 4(m) and citing, e.g., Advisory Committee Notes).  In determining whether to dismiss an action lacking both proper service and good cause to excuse the same, "a court's discretion is guided by three factors: whether '(a) the party to be served received actual notice of the lawsuit; (b) the defendant would suffer prejudice; and (c) plaintiff would be severely prejudiced if his complaint were dismissed.'"  H & A Corp., 2015 WL 5610816, at *2 (quoting Riverdale Mills Corp, 225 F.R.D. at 395).

The relevant framework thus entails a three-step inquiry.  First, I must determine whether plaintiff's service through Boisvert and/or Griffis constitutes proper service upon Van Norman,

Wilder, and Worthen.  If not, the question becomes whether plaintiff has demonstrated good cause for his failure to comply with Rule 4.  If this answer is also in the negative, I must consider whether to nonetheless enlarge plaintiff's time to effect service and provide proof of same.

Service Through Boisvert

Concerning his service through Boisvert, plaintiff hangs his hat on two factors: that Boisvert was listed in the Commonwealth of Massachusetts Corporations Division as Rinchem's registered agent for acceptance of service, and that Boisvert represented to the sheriff who served him that he was the agent authorized to accept service for Van Norman, Wilder, and Worthen.  See Docket # 75 at p. 2.  Both arguments fail.  As to the first, although plaintiff has provided documentation listing Boisvert as the registered agent for *Rinchem*, see Docket # 75-3**,** this designation does not authorize Boisvert to accept service for any of Rinchem's individual employees.  See Bishop v. Trace Investigation Servs., Inc., No. 99 Civ. 942990, 1999 WL 1319002, at *2 (Mass. Super. Mar. 18, 1999) (dismissing action against individual defendant because "service upon the defendant's employer was insufficient."); Wasser v. PricewaterHouseCoopers, LLP, 60 Mass. App. Ct. 1115, 803 N.E.2d 359 (2004) ("Service at the employer's place of business . . . is not sufficient to effect service upon individual employee defendants . . . unless the employer was authorized to accept service on their behalf.") (citing Foley v. Walsh, 33 Mass. App. Ct. 937, 937 n.1, 600 N.E.2d 611 (1992)).  Because Van Norman, Wilder, and Worthen never authorized Boisvert to accept service on their behalf, see Docket # 76-1, 76-2, 76-3, plaintiff's argument to the contrary cannot satisfy plaintiff's burden to prove proper service.  To this end, even assuming *arguendo* that, as plaintiff similarly contends, Boisvert "had organizational authority to accept service" and was "at minimum, [an] implied in fact agent[] for

acceptance of service," <u>see</u> Docket # 75 at p. 2, such designations would not authorize Boisvert to accept service for the individual defendants.

Plaintiff's second argument—that Boisvert represented to the Worcester County Sheriff that he was an authorized agent to accept service for the individual defendants—also falls short. Aside from the fact that this statement is hearsay and not supported by any affidavit or other evidence to this effect, it is flatly contradicted by the sworn affidavits of Van Norman, Wilder, and Worthen in which they state that they never granted such authority.  <u>See</u> Docket # 76-1, 76-2, 76-3; <u>see</u> <u>also</u> <u>Bell v. Holloway</u>, No. 07 Civ. 0846, 2007 WL 4613029, at *3 (S.D. Tex. Dec. 31, 2007) (where plaintiff argued individual who accepted service represented he was authorized to do so, service nonetheless deemed invalid where "Plaintiff has failed to counter [that individual's] asseveration that he was not an authorized agent for any of the three defendants.").  To this end, the sole case cited by plaintiff, <u>Nyholm v. Pryce</u>, 259 F.R.D. 101 (D.N.J. 2009), is instructive.[5] <u>Nyholm</u> found proper service upon individual defendants lacking where "Plaintiff has offered no evidence to show that [the individual defendants] expressly designated the 'Hall, Associate Administrator' to serve as their agent for acceptance of process."  <u>Id.</u> at 104.  Here as well, plaintiff has offered no evidence to this effect; what's more, defendants have offered evidence directly to the contrary, thus rendering the path to <u>Nyholm</u>'s conclusion even smoother here.  I therefore conclude that plaintiff's attempted service through Boisvert was improper.

---

[5] Plaintiff also cites to <u>In re Focus Media Inc.</u>, 387 F.3d 1077 (9th Cir. 2004), which is unavailing in that it centered on "the basic concept that a party's bankruptcy attorney can be authorized impliedly to accept service of process on the client's behalf in a related adversary proceeding."  <u>Id.</u> at 1082.

Service Through Griffis

Plaintiff's argument for proper service through Griffis is deficient for similar reasons, and in fact is even weaker than that concerning Boisvert.  Initially, whereas plaintiff has demonstrated that Boisvert was listed as a registered agent for Rinchem, he has offered no similar documentation concerning Griffis.  Plaintiff's argument thus boils down to his unsupported representation of Griffis' authority and the notion that Griffis' acceptance of service on behalf of other defendants "would strongly suggest her authority to accept service of process . . . for Worthen, Wilder and VanNorman [sic]."  Docket # 75 at p. 3.  Further and more fundamentally, plaintiff's reliance upon NMRA §1-004(F)(3)'s permittance of service at a defendant's actual place of business or employment fails for two reasons.  First, the Amended Complaint identifies Worthen, Wilder, and Van Norman as residents of Massachusetts, and Van Norman and Wilder as employees in Rinchem's Marlborough, MA facility.  See Docket # 30 at ¶¶ 7, 9, 10, 16.  As such, Rinchem's New Mexico office (where Griffis was served) is not these defendants' "actual place of business or employment," as required to satisfy NMRA § 1-004(F)(3).  Second, as noted, the statute's Committee Commentary makes clear that this method may be used only after a plaintiff has tried and failed to effect service in accordance with Rule 1-004(F)(1) and Rule 1-004(F)(2), which entail, respectively, service in-person or by mail and service at a defendant's home.  Having made no showing that he attempted to serve Van Norman, Wilder, or Worthen through either of these

methods, plaintiff was not entitled to rely upon § 1-004(F)(3).[6]  Accordingly, plaintiff's attempt at

service through Griffis fails to satisfy Rule 4.[7]

Enlargement of Time

In light of the conclusion that plaintiff did not properly serve Van Norman, Wilder, and

Worthen, the relevant question becomes whether the court should permit an enlargement of time

for plaintiff to effect service.  As noted, while good cause mandates an enlargement of time to

effect service, this relief may be proper even in the absence of such a showing.  Plaintiff cites

several grounds for a finding of good cause, or alternatively, a determination that the service

window should be extended even in the absence of same: that the individual defendants had

actual notice of the lawsuit, plaintiff's good-faith and diligent attempts at service at two

locations, the lack of prejudice to defendants, the fact that the statute of limitations has not

elapsed, and plaintiff's good-faith belief, based upon the purported representations of various

Rinchem entities, that proper service had been made.  See Docket # 75 at pp. 3-5.

Notwithstanding these factors, I find that plaintiff has not demonstrated good cause for

his failure to properly serve Van Norman, Wilder, and Worthen.  While McIsaac's list of

---

[6] I note that plaintiff's failure to satisfy these prerequisites may also call into question a finding of proper service upon other defendants whom plaintiff served through Griffis.  However, defendants only challenged service in connection with Van Norman, Wilder, and Worthen, and the First Circuit is explicit that a failure to raise a personal jurisdiction defense in a motion to dismiss constitutes a waiver of that defense.  See Pilgrim Badge & Label Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988) (citing Glater v. Eli Lilly & Co., 712 F.2d 735, 738 (1st Cir.1983)).  To this end, "a district court has no authority, *sua sponte*, to dismiss for lack of personal jurisdiction."  Id.

[7] Plaintiff's suggestion that service upon defendants' attorney in the MCAD action, see Docket # 75 at p. 3, likewise is misguided.  "Although there is no First Circuit authority directly on point, the weight of the case law is [that] . . . 'an attorney will not be deemed an appointee for service of a lawsuit on behalf of [his] client simply by virtue of [his] role as an attorney.'"  In re Game Tracker, Inc., 746 F. Supp. 2d 207, 213-14 (D. Me. 2010) (quoting Thelen v. City of Elba, No. 08 Civ. 1150, 2009 WL 212940 at *4 (D. Minn. Jan. 28, 2009) and collecting cases in which service upon attorneys was deemed invalid absent a showing of attorneys' actual authority to receive service).

considerations is not exhaustive, it is, at bottom, instructive as to the underpinnings of a finding

of good cause.  Running through most is the common thread of proper service being

compromised by some exceptional factor, be it process server error, a defendant's evasion of

service, a plaintiff's pro se or in forma pauperis status, or some other "understandable mitigating

circumstance."  See 193 F. Supp. 2d at 383.  Conversely and as noted, good cause expressly is

not found when attorney simply "fail[s] to comply with the clear requirements of Rule 4."  H &

A Corp., 2015 WL 5610816, at *4 (citing Riverdale Mills Corp., 225 F.R.D. at 395).  The events

described above place this case squarely within the second camp.  Defendants did not evade

service, nor did plaintiff's process server commit a mistake, nor is plaintiff proceeding pro se or

in forma pauperis, nor has plaintiff proffered any explanation—outside of his twice attempting to

effect service in manners that fail to conform to Rule 4—for the lack of proper service.

Plaintiff's only saving grace may derive from a showing that he "has acted diligently in

trying to effect service," see McIsaac, 193 F. Supp. 2d at 383, which he attempts to make by

highlighting his being "diligent in his original service at two locations."  See Docket # 75 at p. 4.

I find the relevant facts to convey a different narrative: after inexplicably delaying to serve Van

Norman, Wilder, and Worthen for approximately 117 of the permitted 120 days—a factor

routinely cited as a ground for denying a finding of diligence, see, e.g., McIsaac, 193 F. Supp. 2d

at 383 ("Last minute attempts at service, absent some explanatory justification, do not establish

good cause.") (citing cases)—plaintiff sought to effect service through two means, both of which

were improper.  It is unclear whether plaintiff even attempted to investigate Boisvert's authority

to accept service for Van Norman, Wilder, and Worthen; had he expended any effort in doing so,

he would have found such authority to be wanting.  See Docket # 76-1, 76-2, 76-3.  Plaintiff

similarly failed to satisfy NMRA §1-004(F)(3)'s requirements to (1) serve Van Norman, Wilder,

and Worthen at their "actual place of business or employment"; and (2) exhaust the mechanisms

for service provided in § 1-004(F)(1) and § (F)(2) before relying upon subsection (F)(3).  So

viewed, plaintiff's attempts at service are more aptly categorized as negligent than as diligent; an

unambiguous "[f]ailure to comply with the clear requirements of Rule 4"; nothing more or less.

See H & A Corp., 2015 WL 5610816, at *4 (citing Riverdale Mills Corp., 225 F.R.D. at 395).

Accordingly, I conclude that plaintiff has not demonstrated good cause for his failure to effect

proper service upon Van Norman, Wilder, and Worthen.

As such, the relevant question becomes whether I should nonetheless exercise my

discretion to enlarge the 120-day period for service, a question I likewise answer in the negative.

Initially, Van Norman, Worthen, and Wilder arguably have suffered significant prejudice by

mere virtue of being named in this lawsuit, despite bearing connections to its underlying events

that are tenuous at best.  While true that "the expense incurred in defending against a lawsuit

does not amount to legal prejudice," Rodriguez-Rivera v. Rivera Rios, No. 06 Civ. 1381, 2009

WL 564221, at *2 (D.P.R. Mar. 5, 2009) (quoting Williams v. Peralta Cmty. Coll. Dist., 227

F.R.D. 538, 539 (N.D. Cal. 2005) and citing Westlands Water Dist. v. United States, 100 F.3d

94, 97 (9th Cir. 1996)), it is equally true that plaintiff's actions cannot be viewed in a vacuum.

These actions encompass, *inter alia*, plaintiff's careless drafting of the Amended Complaint—

which makes no mention of these defendants acting outside the scope of their employment and in

fact suggests otherwise, see Docket #30 at ¶ 19—unexplained delays, followed by failed

attempts at proper service, lack of justification therefor, and continued non-action despite

defendants advising plaintiff in May 2015 of the defective service.  See Docket # 76-4, 76-5.

Further, because as discussed below, the sole claim against any of these defendants of which I do

not recommend dismissal (*i.e.* the portion of the sixth count sounding in § 151B as asserted

against Van Norman and Wilder) would not be time-barred if dismissed without prejudice,[8]

plaintiff would not be "severely prejudiced if his complaint were dismissed," see H & A Corp.,

2015 WL 5610816, at *2 (quoting Riverdale Mills Corp, 225 F.R.D. at 395); cf. Advisory

Committee Notes to Fed. R. Civ. P. 4(m), 1993 Amendment ("Relief may be justified, for

example, if the applicable statute of limitations would bar the refiled action . . . .").

Finally, Crevier, supra, warrants further brief exploration for two reasons.  First are its

factual similarities to this case; both include "unfortunate, if easily-preventable, set[s] of

circumstances" consisting of, *inter alia*, last-minute filings and attempts at service on individual

defendants that fell short under Rule 4(m).  See generally 2007 WL 120237.  But Crevier is

notable for an additional reason—plaintiff's counsel in that matter is representing Bell here.  As

stated in McIsaac, supra, "if good cause extensions are given too freely, then the risk is the

emasculation of Rule 4(m) and the defeat of its purpose."  193 F. Supp. 2d 382, 384 (quoting

Wright & Miller, Federal Practice and Procedure: Civil 3d § 1137, at 373-74 (2002)).  Dismissal

was warranted in McIsaac in part because "[plaintiff] knew the rules . . . . [t]he risk of a

dismissal with prejudice is one that he assumed by waiting until two days before the expiration

of the statute of limitations to file his Complaint and then doing nothing until the last minute to

have it served."  See id.  Having had at least one prior lawsuit dismissed due to careless and

dilatory attempts at service, plaintiff's counsel undoubtedly entered this action aware of the

consequences of such conduct.  Yet he persisted in waiting to effect service, doing so

---

[8] See, e.g., Goldstein v. Brigham & Women's Faulkner Hosp., Inc., 80 F. Supp. 3d 317, 323 (D. Mass. 2015) ("Under . . . chapter 151B, a plaintiff must file an administrative complaint with the MCAD or the EEOC within 300 days of the date of the occurrence of the alleged unlawful employment practice. . . . Under chapter 151B, a plaintiff may file a claim in court . . . not later than three years after the alleged unlawful practice occurred.") (citing authorities) (internal quotation marks omitted).

improperly, and failing to act when defendants advised him of this defect.  This is precisely the

"emasculation of Rule 4(m)" of which <u>Crevier</u> warned.  <u>See</u> 193 F. Supp. 2d at 384.

In light of the above, I find neither that plaintiff has demonstrated good cause to excuse

his lack of service, nor that an enlargement of time to effect service is warranted.  Accordingly, I

recommend that pursuant to Rule 12(b)(5) and Fed. R. Civ. P. 4(m), plaintiff's Amended

Complaint be dismissed without prejudice as to Van Norman, Worthen, and Wilder.[9]

### 12(b)(6) Motions

### Legal Standard

On a motion to dismiss under Rule 12(b)(6), the Court "must assume the truth of all well-

plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v.</u>

<u>Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007) (citing <u>Rogan v. Menino</u>, 175 F.3d

75, 77 (1st Cir. 1999)).  Materials attached to a complaint, or incorporated by reference, are a part

of the pleading itself, and the Court may consider them on a motion to dismiss.  <u>Trans-Spec Truck</u>

<u>Serv. v. Caterpillar</u>, 524 F.3d 315, 321 (1st Cir. 2008).  To survive a motion to dismiss, the plaintiff

must state a claim that is plausible on its face.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570

(2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative

level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)."  <u>Id.</u> at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556).  Dismissal is

appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is

---

[9] Notwithstanding this conclusion, the substantive analysis that follows assumes, without concluding, that Van Norman, Wilder, and Worthen are proper defendants.

entitled to relief." <u>Ruiz Rivera v. Pfizer Pharms., LLC</u>, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

<u>Claim #1</u>

Plaintiff's first claim, asserted against Rinchem and CGL, alleges violations of a number of statutes, <u>see</u> Docket #30 at ¶¶ 62-65, but seeks relief under only one: 46 U.S.C. § 80507, which concerns the prohibition on the discharge or discrimination against an employee who has reported the existence of an unsafe container.  Rinchem and CGL argue for dismissal on timeliness grounds, stating that under the statute, a plaintiff must file a complaint with the Secretary of Labor within sixty days of the alleged violation.  <u>See</u> 46 U.S.C. § 80507(b).  The Amended complaint alleges that plaintiff filed an administrative charge on or about November 25, 2013, well beyond sixty days after his July 16, 2013 termination (Docket #30 at ¶¶ 42, 46).[10] Plaintiff's sole response is a recasting of the statute of limitations—he states that "he filed a complaint with the Secretary of Labor not later than 180 days after the alleged violation

---

[10] Rinchem and CGL also seek dismissal of the first claim insofar as it sounds in 29 U.S.C. § 660(c), one of the statutes referenced in the Amended Complaint.  Although, due to the fact that plaintiff here seeks recovery only under 46 U.S.C. § 80507(b), I need not determine whether the § 660(c) claim is timely, I note that if the Amended Complaint demanded an answer to this question, it would be in the negative, since that statute provides a plaintiff even less time than § 80507(b)—thirty days—to file a complaint.  <u>See</u> 29 U.S.C. § 660(c)(2).

Section 660(c) is notable for an additional reason.  While both it and § 80507 offer substantively identical language regarding the time period after a violation during which an employee "*may* . . . file a complaint with the Secretary," <u>see</u> <u>id.</u>; 46 U.S.C. § 80507(b) (emphasis added), neither statute explicitly mandates that this be done.  Nonetheless, § 660(c)'s thirty-day period has been construed as either a jurisdictional prerequisite or a statute of limitations, <u>see</u> <u>Donovan v. Hahner, Foreman & Harness, Inc.</u>, 736 F.2d 1421, 1423 (10th Cir. 1984), a distinction that is without a difference as regards the instant motion.  In either event, the statute establishes a "*requirement* that an employee must file a complaint with the Secretary of Labor within 30 days of a violation."  <u>See</u> <u>Kirkendall v. Dep't of Army</u>, 412 F.3d 1273, 1276 (Fed. Cir. 2005) (citing <u>Donovan v. Hahner, Foreman & Harness, Inc.</u>, 736 F.2d 1421, 1424 (10th Cir. 1984)), <u>reh'g and reh'g en banc granted</u>, <u>judgment vacated</u>, 159 F. App'x 193 (Fed. Cir. 2006) (emphasis added).  Thus, although case law concerning 46 U.S.C. § 80507(b) is scant, I infer that that statute, like § 660(c), provides the time within which an employee *must* file a complaint with the Secretary of Labor.

occurred" (Docket #57 at p. 10).  While this may be true, it does not salvage the timeliness of this claim, which requires a complaint to have been filed by September 14, 2013.  Accordingly, I recommend dismissal of plaintiff's first claim as untimely.[11]

Claim #2

Unlike the statutes discussed above, 49 U.S.C. § 31105, which provides the basis for plaintiff's second claim against Rinchem and CGL, affords an aggrieved party 180 days to file a complaint with the Secretary of Labor.  49 U.S.C. § 31105(b)(1).  Rinchem's sole basis for dismissal of this claim is the same as that articulated above—that plaintiff failed to make a timely complaint to the Secretary of Labor.  As noted, however, plaintiff's November 25, 2013 "written notice of violations in writing to the Department of Labor" falls within § 31105's limitations period.  Accordingly, I recommend denial of the portion of Rinchem's motion seeking dismissal of this claim.[12]

---

[11] Additionally, § 80507(c) provides that if the Secretary of Labor finds there has been a violation, *the Secretary of Labor* may bring a civil action.  Accordingly, it is unclear whether, in the first instance, this provision affords a private right of action to an aggrieved party.  Plaintiff's argument that "[t]he federal law provides that if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action," Docket #57 at p. 11, plainly applies to, *inter alia*, 49 U.S.C. § 31105 actions; however, plaintiff points to no authority that this holds true in § 80507 matters.  In any event, I need not decide this question since, as stated above, plaintiff's § 80507 claim is untimely.

[12] I note that "there is no separate private right of action outside the scheme set forth in [49 U.S.C. § 31105]."  See, e.g., Bailiff v. Davenport Transp., Inc., No. 13 Civ. 308, 2013 WL 6229150, at *3 (W.D.N.C. Dec. 2, 2013) (citing Kornischuk v. Con–Way Cent. Express, No. 03 Civ. 10013, 2003 WL 21977202, at *3 (S.D. Iowa June 4, 2003)).  As indicated, the statute provides the mechanism by which an aggrieved employee may file a complaint with the Secretary of Labor, who shall then conduct an investigation and may, under certain circumstances, ultimately file a civil action.  See 49 U.S.C. §§ 31105(b)(2)(A), 31105(e).  As also noted, however, the scheme set forth in the statute also contemplates a private right of action in the event that "the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and [ ] the delay is not due to the bad faith of the employee."  See 49 U.S.C. § 31105(c).  Although plaintiff's allegations in this regard are far from a model for clarity, it appears that no final decision was issued within 210 days of his filing of an OSHA complaint in November 2013.  See Docket #30 at ¶¶ 46-48.  Moreover, defendants have not argued for dismissal of this claim on this ground.  Accordingly, plaintiff's second claim does not fail on account of the rationale discussed herein.

CGL's motion includes a catchall argument that the company is mentioned only three times throughout the Amended Complaint (paragraphs 3, 8, and 17) and that plaintiff has made no factual allegations concerning it, thus failing under Iqbal and Twombly.  See Docket # 32 at pp. 4-5.  While the former contention is plainly incorrect, see Docket # 30 at ¶¶ 53, 58, 98, the latter holds water.  As regards Count II, for example, the first mention of CGL appears in the claim's "wherefore" clause.  See id. at p. 25.[13]  Accordingly, I recommend that plaintiff's second claim be dismissed as against CGL.

Claim #3

Plaintiff's third claim arises from M.G.L. c. 149 § 185, which proscribes "[r]etaliation against employees reporting violations of law or risks to public health, safety or environment." The statute's purview, however, is exclusive to employees of "the commonwealth, and its agencies or political subdivisions."  Id. at §(a)(1)-(2); see, e.g., U.S. ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc., No. 11 Civ. 12017, 2014 WL 3897645, at *10 (D. Mass. Aug. 7, 2014) (dismissing § 185 claim because the "subject law applies only to public employers"); Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 97 (D. Mass. 2003) (statute "gives *a municipal employee* a civil claim for damages against a city or town that takes 'retaliatory action' against him") (emphasis added), aff'd sub nom. Wagner v. City Of Holyoke,

---

[13] Plaintiff's contention, raised for the first time at oral argument, that CGL nonetheless may be liable on an aiding and abetting theory is a non-starter for three reasons. First, CGL's liability, if any, would sound in the alleged underlying tort, not CGL's aiding and abetting same. Cf. Burnett v. Rowzee, No. 07 Civ. 641 2007 WL 4754539, at *6 (C.D. Cal. Oct. 18, 2007) ("[I]f a defendant is primarily liable, a claim for 'aiding and abetting' is superfluous."). Second, as noted, plaintiff never raised this argument in his opposition, and as such defendants have not had an opportunity to respond. See, e.g., Gorman v. Coogan, No. 03 Civ. 173, 2005 WL 758468, at *1 (D. Me. Mar. 28, 2005) ("I do not address arguments that the parties did not raise in their written submissions, but tried to raise for the first time at oral argument . . . ."). Finally and perhaps most fundamentally, this argument fails on its merits—the Amended Complaint contains no substantive and non-conclusory allegations of CGL (by which, it bears repeating, plaintiff was not employed) aiding and abetting Rinchem's alleged violation of 49 U.S.C. § 31105.

Massachusetts, 404 F.3d 504 (1st Cir. 2005).  Plaintiff makes no claim—nor does the record indicate—that he is a municipal employee.  M.G.L. c. 149 § 185 therefore does not apply to him, and as such, I recommend that the third claim be dismissed.

Claim #4

Plaintiff's fourth claim sounds in wrongful termination, for which Massachusetts common law provides redress to "employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)."  Annobil v. Worcester Skilled Care Ctr., Inc., No. 11 Civ. 40131 (TSH), 2014 WL 4657295, at *12 (D. Mass. Sept. 10, 2014) (quoting Perez v. Greater New Bedford Vocational Technical Sch. Dist., 988 F. Supp. 2d 105, 113 (D. Mass. 2013)) (internal quotation marks omitted).  A cause of action thus will lie, for example, "when an employee is fired . . . for enforcing safety regulations for which she was responsible."  Id. (quoting Perez, 988 F. Supp. 2d at 113).

The moving defendants posit several grounds for dismissal of this claim, most fundamental of which is the notion that a "cause of action for wrongful termination in violation of public policy does not apply where there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme."  Perez, 988 F. Supp. 2d at 113 (quoting Melley v. Gillette Corp., 19 Mass. App. Ct. 511, 513 (1985), aff'd, 397 Mass. 1004, 491 N.E.2d 252 (1986)). Plaintiff's wrongful termination claim falls squarely within that category, as the Amended Complaint includes claims arising from reported violations of 29 U.S.C. § 660(c), 46 U.S.C. § 80507(b), and 49 U.S.C. § 31105(a)(1), for which statutory remedies exist.

In response, plaintiff cites to Perez, notwithstanding that case cutting directly against plaintiff's position.  See 988 F. Supp. 2d at 113 (dismissing wrongful termination public policy claim as duplicative under rationale stated above).  He also cites a passage from 49 U.S.C. § 31105(f) that "[n]othing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law."  See Docket # 55 at pp. 7-8.  This argument also fails.  First, the public policy exception to at-will employment is plainly a creature of common law (i.e. not "provided by Federal or State law"), and further, its rationale "is that, unless a remedy is recognized, there is no other way to vindicate such public policy." Melley, 19 Mass. App. Ct. at 512 (quoting Wehr v. Burroughs Corp., 438 F.Supp. 1052, 1055 (E.D. Pa.1977), aff'd. with modification on other grounds, 619 F.2d 276 (3d Cir. 1980)).  Under the present circumstances, plaintiff, at least in theory, has at his disposal statutory remedies to vindicate public policy.  Accordingly, the statutory remedial schemes offered by 29 U.S.C. § 660(c), 46 U.S.C. § 80507(b), and 49 U.S.C. § 31105(a)(1) render duplicative plaintiff's common law wrongful termination claim.[14][15]  I therefore recommend dismissal of plaintiff's fourth claim.

---

[14] In addition, CGL argues for dismissal because it was not plaintiff's employer and so could not have terminated him.  In the absence of any substantive argument to the contrary, I agree that the fourth claim should be dismissed as against CGL on this independent ground.

[15] Although this conclusion renders somewhat academic the individual defendants' fact-specific arguments for dismissal, I offer the following brief analysis.  These arguments rest upon the general notion that while "[u]nder Massachusetts law, a high corporate officer may be personally liable for the torts a corporation commits at his direction," Union Mut. Life Ins. Co. v. Chrysler Corp., 793 F.2d 1, 11 (1st Cir. 1986) (citing cases), such liability entails the "direct participation of the officer in the wrongful conduct or wrongful conduct committed at the direction of the corporate officer." Devlin v. WSI Corp., 833 F. Supp. 69, 78 (D. Mass. 1993).  Although the case law is not entirely clear whether individual liability attaches only to "high corporate officers" as suggested by Union Mutual, a review of the relevant authority reveals that the prospect of individual liability generally is entertained only in connection with individuals holding such positions.  See, e.g., Union Mut. Life, 793 F.2d at 11 (1st Cir. 1986) (considering individual liability of company's principal officer); Alves v. Daly, No. 12 Civ. 10935, 2013 WL 1330010, at *9 (D. Mass. Mar. 29, 2013) (considering question of individual liability regarding manager who is "responsible for creating policies and procedures concerning the safety of patrons").

Claim #6[16]

Plaintiff's sixth claim, sounding in unlawful discrimination and retaliation, arises from 42 U.S.C. § 2000(e) ("Title VII") and its state law analogue, M.G.L. c. 151B § 4.  See McKenzie v. Potter, No. 02 Civ. 10727, 2004 WL 1932766, at *3 (D. Mass. Aug. 20, 2004).  The former makes it illegal to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  Similarly, the state statute provides that "no 'person, employer, [or] labor organization' may 'discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding' covered by the statute."  Charles v. Stop & Shop Supermarket Co., LLC, No. 10 Civ. 10726, 2012 WL 2402790, at *6 (D. Mass. June 25, 2012) (quoting M.G.L. c. 151B § 4(4)).

"A plaintiff claiming retaliation under Title VII and Chapter 151B must show that: (1) he engaged in protected activity; (2) he suffered some materially adverse action; and (3) the adverse action was causally linked to his protected activity."  Id. (citing Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 & n.4 (1st Cir.2007)); see also Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005) ("To engage the gears of either statute, a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two

---

As stated, the fact that this claim fails on independent grounds makes a granular defendant-by-defendant analysis unnecessary here.  For present purposes however, it suffices to say that—even setting aside the preclusion of a common law cause of action in the face of statutory remedies—individual liability certainly attaches only to those defendants who participated in or directed the harm of which plaintiff now complains, and might attach only to those who inhabit a "high corporate office[]."

[16] Defendants have not sought dismissal of plaintiff's fifth claim.

were causally linked.") (citing cases); <u>Villanueva v. Wellesley Coll.</u>, 930 F.2d 124, 127 n.2 (1st

Cir. 1991) ("We do not distinguish further among the various statutes [including, *inter alia*, Title

VII and M.G.L. c. 151B § 4], as the standards of liability under all are substantially identical.")

(citing cases).  Both Title VII and Chapter 151B retaliation claims

> are evaluated according to the three stage <u>McDonnell Douglas</u> burden-shifting framework.  Under this rubric, the plaintiff carries the initial burden of establishing a prima facie case of retaliation by showing: (1) she engaged in protected conduct under Title VII and Chapter 151B; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action.  Once a prima facie showing has been made, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  If the defendant articulates a non-retaliatory reason, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.

<u>Sullivan v. Massachusetts Bay Commuter R. Co., LLC</u>, No.07 Civ. 10875, 2009 WL 1067184, at

*11 (D. Mass. Apr. 22, 2009) (internal citations and quotation marks omitted).

Defendants seek dismissal of the Title VII claim primarily on the ground that Title VII

prohibits retaliation for opposing discrimination only on the basis of race, color, national origin,

sex, or religion, and as such, is inapplicable here.  As a result, defendants contend, plaintiff has

failed to satisfy the first prong of a prima facie Title VII retaliation case.  Plaintiff makes no

attempt to substantively attack this argument, instead trying to elude it by analogizing Title VII

with other statutes that do incorporate age discrimination.  <u>See</u> Docket #55 at pp. 8-9.  This is

unsurprising, as the relevant authority plainly supports defendants' position.  <u>See, e.g.</u>, <u>Lennon v.</u>

<u>Rubin</u>, 166 F.3d 6, 8 (1st Cir. 1999) ("[S]ince Lennon's previous complaints related to age rather

than to a category protected under Title VII, his retaliation claims are not cognizable under Title

VII."); <u>Cruz-Claudio v. Garcia Trucking Serv., Inc.</u>, 639 F. Supp. 2d 198, 200 (D.P.R. 2009)

("Title VII . . . prohibits discrimination based on 'race, color, religion, sex, or national origin . . . .' Age is not one of the protected classes of this statute.  The Equal Employment Opportunity Act of 1972 . . . was enacted to amend the Civil Rights Act to include additional definitions as well as enforcement and other provisions.  It does not, however, amend Title VII to prohibit age discrimination.") (internal citation omitted).  Thus, because (1) a prima facie case of retaliation under Title VII requires, first and foremost, that the plaintiff engaged in protected conduct under Title VII, and (2) Title VII does not proscribe retaliation based on age discrimination, I recommend that plaintiff's Title VII claim be dismissed.[17]

Plaintiff's M.G.L. c. 151B § 4 claim requires somewhat more scrutiny, particularly because the defendants each seek dismissal on unique and fact-intensive grounds.  Further, because a 151B § 4 claim may proceed on the basis of age discrimination, see, e.g., Koster v. Trans World Airlines, Inc., 181 F.3d 24, 30 (1st Cir. 1999), this portion of plaintiff's sixth claim, unlike the Title VII claim, may not be summarily dismissed.  Accordingly, I will address each set of moving defendants' arguments for dismissal *seriatim*.

Boisvert, Inman, and Candelaria[18] argue that the Amended Complaint fails for its lack of specific allegations against these defendants.  See generally Docket # 36 at pp. 7-8.  I disagree. Initially, the Amended Complaint alleges that plaintiff complained to each of these defendants

---

[17] I note that plaintiff's sixth claim discusses more than allegations of age discrimination; it also references, for example, "the hostile work environment created when plaintiff was threatened with job loss if he did not accept responsibility for alleged health and safety law violations committed by defendants' **[sic]** compelling plaintiff to violate the law and save his job."  Docket #30 at ¶ 89.  Because, however, these actions—like the alleged age discrimination—fall outside the umbrella of "any practice made an unlawful employment practice by" Title VII, see 42 U.S.C. § 2000e-3, they too cannot provide the basis of a Title VII retaliation claim.

[18] This portion of Rinchem, Boisvert, Inman, and Candelaria's brief expressly seeks dismissal of this claim only as to the individual defendants.  See Docket #36 at p. 7.  Accordingly, this portion of plaintiff's sixth claim survives as to Rinchem.  However, to the extent this claim sounds in an aiding and abetting theory, such claim fails as against Rinchem as superfluous of the underlying claim.  See, e.g., Richards v. Walter Fernald State Sch., No. 96 Civ. 1357, 2000 WL 1473024, at *4 (Mass. Super. July 31, 2000).

about being wrongfully blamed as well as about defendants' unlawful practices.  See Docket #
30 at ¶ 32.  Boisvert is also alleged to have accused plaintiff of being at fault in connection with
the diborane shipment, issued plaintiff's suspension and written warning, (incorrectly) told
plaintiff that the shipment was not accepted in Tel Aviv, and forced plaintiff, at threat of
termination, to sign a memo accepting responsibility.  See id. at ¶¶ 23, 28.  While these
allegations, standing alone, do not implicate § 151B, they must be read in conjunction with the
allegation that plaintiff complained about age discrimination to Boisvert, who told plaintiff that if
he complained further, he would be fired, see id. at § 35, an allegation that, if true, would trigger
liability under the statute.

Inman and Candelaria were more directly involved in Bell's termination.  Inman
conducted a hearing by telephone on July 16, 2013, the day plaintiff was fired, during which
plaintiff "testified to the facts surrounding the egregious unfair discipline that perpetuated unsafe
conditions and cited numerous other violations."  See Docket # 30 at ¶ 38.  Plaintiff's testimony
"was met with disdain and bias and was denied" by Inman and Candelaria.  Id.

Thus, the Amended Complaint clearly contains factual allegations against Boisvert, Inman,
and Candelaria.  The question, then, is whether these allegations suffice to impose individual
liability against them.  I conclude that they do—Inman and Candelaria appear to have been
instrumental in the events immediately preceding plaintiff's termination, and Boisvert, while not
directly tied to plaintiff's termination (the Amended Complaint actually states that Boisvert was
at a meeting in New Mexico when plaintiff was terminated, id. at ¶ 42), was heavily involved in
the post-diborane shipment fallout, and more significantly, threatened plaintiff with termination if
his age discrimination complaints continued.  The statute is broadly interpreted to "provide
individual liability where 'any person' acts in a way that interferes with the rights secured under

Chapter 151B."  See Ruffino v. State St. Bank & Trust Co., 908 F. Supp. 1019, 1048 (D. Mass. 1995).  Moreover, these defendants may be liable, at bottom, on an aiding and abetting theory. See id. (statute applies to "any person who aids and abets discriminatory or retaliatory conduct prohibited under Chapter 151B, as well as to any person who interferes with another's right to work free of unlawful discrimination and retaliation").  Boisvert, Inman, and Candelaria each fall squarely within these categories.  Cf. Daigle v. NECX,Inc., No. 99 Civ. 1555D, 2001 WL 1199868, at *3 (Mass. Super. Feb. 23, 2001) (dismissing 151B claim against individual defendants where "there are no specific factual assertions that either defendant discriminated against the plaintiff nor that either aided or abetted any such conduct by others").  Accordingly, I recommend that this portion of plaintiff's sixth claim survive as to Boisvert, Inman, and Candelaria.

As noted, CGL and Brienholt's motion argues that the Amended Complaint lacks substantive allegations to support a finding of liability against them.  See Docket # 32 at pp. 4-5. As applied to (at least) plaintiff's sixth claim, this argument has merit.  The extent of the allegations against CGL is that it is vicariously liable for the actions of its employees, which it knew of and failed to address.  See Amended Complaint at ¶¶ 53, 58.  This is entirely conclusory, and in any event, nowhere does plaintiff allege any of the individual defendants worked for CGL (with the exception of Brienholt, who is President of both CGL and Rinchem).  As above, the first mention of CGL in connection with the Sixth Claim is in the claim's "wherefore" clause.  See Docket # 30 at p. 33.  Similarly, plaintiff merely alleges Brienholt is part of the "upper management" to which plaintiff complained of safety violations.  See id. at ¶ 57.  Notwithstanding § 151B's broad construction, this allegation, like those against CGL, is far too thin to support a finding of liability. Accordingly, I recommend that the portion of plaintiff's sixth claim sounding in § 151B be dismissed as against CGL and Brienholt.

Finally, Van Norman, Wilder, and Worthen argue for dismissal on similar grounds. Worthen's argument has merit; the crux of the allegations against him are that he was responsible for the unauthorized use of plaintiff's signature.  See id. at ¶¶ 40-41.  Improper though this may be, it does not support a claim under § 151B.  Van Norman and Wilder, however, effectuated plaintiff's termination, which plaintiff alleges was motivated by, *inter alia*, age discrimination, plaintiff's complaints of which the individual defendants are alleged to have been aware.  See id. at ¶¶ 42-43, 58.  Although discovery may reveal that § 151B liability is unwarranted, reading the Amended Complaint in the light most favorable to plaintiff, it is plausible to construe Van Norman and Wilder's termination of plaintiff—an adverse employment action by any reasonable measure—as their "act[ing] in a way that interferes with the rights secured under Chapter 151B."  See Ruffino, 908 F. Supp. at 1048.  Accordingly, I recommend that this claim be dismissed as to Worthen but that it survive as to Van Norman and Wilder.

Claim #7

Plaintiff's seventh claim sounds in breach of contract and implied covenant of good faith and fair dealing, and is premised upon Rinchem's employee handbook, which, plaintiff contends, constitutes an enforceable employment contract between plaintiff and Rinchem.  See Docket #30 at ¶ 92.  Defendants seek dismissal on the ground that the handbook is not a binding contract, which, if true, would undermine both of the claims asserted here, as well as the breach of implied contract claim contained in Count IX.  See, e.g., Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 229-30 (1st Cir. 2005) (no breach of contract, breach of implied contract, or breach of covenant of good faith and fair dealing without enforceable contract).

As support, defendants cite portions of the handbook which provide that

> [t]he following sections of this handbook are intended to be general descriptions of Rinchem's employment practices and are not to be construed as a contract, expressed or implied, of employment. They are for the general information of the staff member and are subject to change and modification from time to time, or at any time that it is deemed appropriate by management.
>
> Rinchem Company, Inc. is an "at will" employer which means that it has the right to terminate a staff member at any time and for any reason, nothing in this handbook is to the contrary (See Section C, Chapter 6, Separation from Employment). It is not the practice of Rinchem to enter into employment contracts, expressed or implied.

Docket #36-1 at p. 9.[19]  Defendants also reference the handbook's statement that the list of violations contained therein is "not to be misconstrued as a departure for employment at will." See Docket #36-1 at p. 37.

The First Circuit in Hinchey v. NYNEX Corp., 144 F.3d 134 (1st Cir. 1998), stated that under Massachusetts law, "a personnel manual may, in some cases, form the basis of [a binding] contract." Id. at 141 (citing O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 664 N.E.2d 843, 847 (1996); Hobson v. McLean Hosp. Corp., 402 Mass. 413, 522 N.E.2d 975, 977 (1988)).  It explained that

> [t]here is no explicit test or rigid list of prerequisites to aid in ascertaining if a personnel manual comprises a binding contract under Massachusetts law.  Rather, factfinders must consider several factors recently articulated by the SJC in Jackson [v. Action for Boston Community Development, Inc.], 403 Mass. 8, 525 N.E.2d 411, which held that no implied contract based on the terms of the personnel manual existed where: 1) the employer retained the right to unilaterally modify terms; 2) the terms of the manual were not negotiated; 3) the manual stated that it provided only guidance regarding the employer's policies; 4) no term of employment was

---

[19] "In reviewing a . . . Rule 12(b)(6) motion, we may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'"  Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

> specified in the manual; 5) the employee did not sign the manual to manifest assent.  The SJC has clarified that these factors are not an inflexible list, but rather a set of circumstances which would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract.

Id. (internal citations and quotation marks omitted).

Applying this framework, I find that the Rinchem handbook does not constitute a valid contract.  At least four of Jackson's factors plainly militate against plaintiff's suggestion that it is: (1) the terms of the handbook expressly were "subject to change and modification from time to time, or at any time that it is deemed appropriate by management"; (2) there is no indication the terms were negotiated; (3) the terms were "intended to be general descriptions of Rinchem's employment practices and are not to be construed as a contract, expressed or implied, of employment.  They are for the general information of the staff member . . . ."; and (4) the term of employment was expressly "'at will' . . . which means that [Rinchem] has the right to terminate a staff member at any time and for any reason, nothing in this handbook is to the contrary . . . ." And while it appears that the handbook included a space for Bell's signature, see Docket #36-1 at p. 80, this lone factor in plaintiff's favor does not countervail the balance of the relevant determinants cutting against him.  Finally, and perhaps most significantly, the handbook contains an express disclaimer that it is "not to be construed as a contract, expressed or implied, of employment."  See Docket #36-1 at p. 9.  Although, as noted, Jackson provides a non-exhaustive list of relevant considerations, the factors articulated above render it implausible for Bell to "reasonably have believed that the employment manuals he . . . was given constituted the terms or conditions of employment, equally binding on employee and employer."  Hinchey, 144 F.3d at 141 (quoting Derrig v. Wal–Mart Stores, Inc., 942 F.Supp. 49, 55 (D. Mass. 1996)) (internal quotation marks omitted).

Under these circumstances, it would strain credulity to construe the handbook as a binding employment contract.  See, e.g., Hinchey, 144 F.3d at 141 (no contractual rights where handbook was not negotiated, did not contain a term of employment, and included disclaimer that employer could unilaterally modify terms); Day v. Staples, Inc., 555 F.3d 42, 59 (1st Cir. 2009) ("Given these disclaimers, the absence of any negotiation over the terms, and the absence of any specified term of employment, Day could not 'reasonably have believed that the employment manuals he . . . was given constituted the terms or conditions of employment, equally binding on employee and employer.'") (quoting Hinchey, 144 F.3d at 141) (internal quotation marks omitted); Hillstrom v. Best W. TLC Hotel, 265 F. Supp. 2d 117, 129 (D. Mass. 2003) (no contract where employee handbook acknowledgment form stated handbook was offered "as a matter of information only," that policies described therein were not conditions of employment, that employer "reserve[d] the right to modify, revoke, suspend, terminate or change any and all such [policies] at any time," that "handbook [wa]s not intended to create, nor is it to be construed to constitute, a contract between [employer] and any one or all of its employees," and that plaintiff's employment was at-will, with either party capable of terminating employment relationship at any time), aff'd, 354 F.3d 27 (1st Cir. 2003); Chilson v. Polo Ralph Lauren Retail Corp., 11 F. Supp. 2d 153, 157 (D. Mass. 1998) (no contract where "Polo's Employee Handbook states no term of employment, its content was not a subject of negotiation, and Polo retained the right to modify the Handbook unilaterally. The Handbook repeatedly reminds employees (in bold print) that its provisions do not form the basis of an employment contract, and that Polo has the right to fire employees at any time without cause.").

Latimer v. Alternatives Unlimited, Inc., No. 10 Civ. 02245, 2012 WL 3005742 (Mass. Super. May 21, 2012) appears to suggest a contrary conclusion, but ultimately is distinguishable.[20] In Latimer, the court found the potential existence of a contract despite several of the Jackson factors cutting in the opposite direction.  See id. at *4-5.  Latimer's conclusion, however, was expressly premised on the fact that the manual "specifically lays out a reciprocal relationship between Alternatives and its employees."  Id. at *5 (citing portion of handbook stating that "[r]eciprocally, it is expected that employees will conduct themselves in a professional manner, and will contribute to promoting and sustaining a positive image of the agency and the people we serve within the community we serve.").  Initially, I am not persuaded that this detail suffices to outweigh factors such as the Rinchem handbook's disclaimer, the lack of either the possibility of negotiation of terms or a term of employment, and both parties' right to terminate the employment at any time with or without cause.  But even if the existence of a statement on the employer's expectations were afforded the same weight given to it by Latimer, no similar language of express reciprocity appears in the Rinchem handbook.  At most, the handbook provides that "we expect personal challenge and the satisfaction of accomplishment in an environment that encourages teamwork and provides individual growth opportunities; honorable, respectful, safe and pleasant working conditions; and exceptional financial rewards."  See Docket #36-1 at p. 10.  This provision appears in a portion of the Rinchem handbook entitled "MUTUAL EXPECTATIONS," which

---

[20] Plaintiff cites several other cases which fail to support his position: Jackson, which reached the "inexorable [conclusion] that no implied contract based on the personnel manual's terms existed," 403 Mass. at 14; Hinchey, which, as noted, cuts against plaintiff's position, 144 F.3d at 141; and O'Brien, which expounded on the nature of personnel manuals as construed by Jackson and ultimately denied the plaintiff's claim for her failure to follow her company's grievance procedure.  See generally 422 Mass. at 690-95. Finally, Beebe v. Williams Coll., 430 F. Supp. 2d. 18 (D. Mass. 2006) focused its inquiry on "other factors outside the four corners of the handbook, in addition to the elements set forth in Jackson," an approach I decline to follow here, where even a liberal application of the Jackson factors disposes of the question at hand.

also sets forth the disclaimers described above which support the notion that the handbook is not

a contract.  See Docket #36-1 at p. 9.  Moreover, Latimer's holding also relied on the fact that "it

is unclear whether the Manual provides only guidance on Alternatives' policies, or whether it could

be understood as setting forth detailed and mandatory mutual obligations."  See id. at *5 n.7.  This,

of course, stands in contrast to the Rinchem handbook guidelines, which are explicitly "intended

to be general descriptions of Rinchem's employment practices and are not to be construed as a

contract, expressed or implied, of employment.  They are for the general information of the staff

member . . . ."[21]

In light of the foregoing, I recommend dismissal of plaintiff's claims for breach of contract.

As noted, it follows that the covenant of good faith and fair dealing claim likewise should fail.

See, e.g., Massachusetts Eye & Ear Infirmary, 412 F.3d 215, 230 (1st Cir. 2005) ("Having

concluded that no contract exists, there can be no derivative implied covenant of good faith and

fair dealing applicable to these parties.").  Finally, to the extent plaintiff's ninth claim sounds in

breach of implied contract, that claim likewise should be dismissed.  See id.

---

[21] I am not convinced by Bell's argument that the handbook's statement "that plaintiff could be terminated at any time 'so long as there is no violation of applicable federal, state or local law,'" see Docket # 57 at p. 18 (quoting Docket #36-1), gives rise to an enforceable contract.  In addition to the fact that Bell cites no authority supporting this contention, the very next sentences in the handbook state that "Rinchem's policy statements, manuals, handbooks, etc. do not represent implied or expressed contractual terms of employment.  Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document."  See Docket #36-1 at p. 80.  A simpler and more accurate reading of plaintiff's cited provision is that Rinchem may not terminate an employee if such termination constitutes a legal violation.  Clearly, such a statement neither alters plaintiff's status as an at-will employee, nor converts the handbook into a binding contract.

Finally, Bell's attempt to find a binding contract in "the confidentiality provisions intended by defendant to be binding upon plaintiff," Docket #57 at p. 18, also falls short.  The sole case cited in support, DeCaro v. Hasbro, Inc., 542 F. Supp. 2d 141 (D. Mass. 2008), makes no mention of this proposition, and in fact concluded that "[a]s Plaintiff is unable to show there was a binding agreement, his breach of contract claim necessarily fails."  Id. at 153.  Nor does plaintiff provide any authority to support his contention that the portions of the handbook prohibiting age discrimination, harassment, and unlawful retaliation should alter the conclusion set forth above.

Claim # 8

Plaintiff's Count VIII incorporates three claims—misrepresentation, conspiracy, and negligent supervision. I will address each claim *seriatim*.

Misrepresentation

"To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment. . . ." Rodowicz v. Massachusetts Mut. Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002) (quoting Zimmerman v. Kent, 31 Mass.App.Ct. 72, 575 N.E.2d 70, 74 (1991)). Two sets of moving defendants seek dismissal on the ground that the Amended Complaint fails to allege how plaintiff relied on any statements to his detriment. CGL and Brienholt's motion contends that dismissal is warranted because plaintiff does not allege any statements made by these defendants.

Plaintiff's substantive response to each motion is identical: "that he relied to his detriment upon the false representations that defendants would cease placarding STAA violations and forging plaintiff's name to shipping safety certifications, and cease in what was perceived to be age discrimination and retaliatory conduct, and, to not terminate him in violation of federal, state or local laws, and his reliance upon protected employment activity surrounding reporting these employment conditions led to his termination." Defendants argue on reply that these are new allegations, absent from the Amended Complaint, and as such should be disregarded. I agree; there are no allegations in the Amended Complaint that defendants assured plaintiff they would cease STAA violations, forgery, age discrimination, or retaliation.[22] The only possible ground

---

[22] At oral argument, plaintiff sought to premise liability upon the notion that, by forging plaintiff's signature, defendants induced plaintiff to "just keep going," *i.e.* to go about his business as though nothing was amiss. This theory falls well outside the framework of a "false statement of a material fact made to induce the

upon which this claim may be salvaged is that plaintiff relied on the Rinchem handbook's representation that plaintiff would not be fired for reporting violations.  Even this is a stretch to read into the operative portion of the Amended Complaint (¶ 97), which consists of boilerplate statements about defendants' duty to plaintiff and how the breach thereof caused plaintiff's termination.  But more fundamentally, this representation is best categorized as a promise, rather than a statement of material fact.  As explained by the court in <u>Catalfo v. Kindred Nursing Centers W., LLC</u>, No. 01 Civ. 365-M, 2003 WL 21251885 (D.N.H. May 30, 2003),

> a promise is not a statement of fact and hence cannot, as such, give rise to an action for misrepresentation, [but] a promise can imply a statement of material fact about the promisor's intention and capacity to honor the promise.  A promise, therefore, will only give rise to a claim of misrepresentation if, at the time it was made, the defendant had no intention to fulfill the promise.

<u>Id.</u> at *3 (quoting <u>Thompson v. H.W.G. Grp., Inc.</u>, 139 N.H. 698, 701, 664 A.2d 489, 491 (1995)) (internal citation omitted). There being no indication that Rinchem made this promise with the intention of breaking it, plaintiff's misrepresentation claim cannot sustain.   Accordingly, I recommend that this claim be dismissed.

<u>Conspiracy</u>

"The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."  <u>Natale v. Espy Corp.</u>, No. 13 Civ. 30008, 2015 WL 3632227, at *10 (D. Mass. June 2, 2015).  Massachusetts law recognizes the tort of conspiracy in two forms: one is "true conspiracy," which occurs when the conspirators, acting in unison, exercise a peculiar power of coercion over a plaintiff that they would not have had if

---

plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment." <u>See</u> <u>Rodowicz</u>, <u>supra</u>.

they had acted alone; the other ascribes liability to those who substantially assist or encourage others to commit torts.  Wajda v. R.J. Reynolds Tobacco Co., 103 F. Supp. 2d 29, 37 (D. Mass. 2000) (citing cases).

Defendants cite numerous grounds for dismissal of this claim: that the cited statute (42 U.S.C. 1981) involves only race, and not age, discrimination, the lack of factual allegations that individual defendants conspired, and that a company cannot "conspire" with itself, or with its employees, unless those employees were acting outside the scope of their employment.  Plaintiff's three oppositions do not address **any** of these arguments; it is hard to construe this silence as anything less than a concession to defendants' position.  And indeed, the First Circuit is explicit that "an entity cannot conspire with itself."  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 131 (1st Cir. 2006); see also Wentworth Precious Metals, LLC v. City of Everett, No. 11 Civ. 10909, 2013 WL 441094, at *14 (D. Mass. Feb. 4, 2013) ("The conspiracy claim fails under both federal and state law for the independent reason that the City cannot conspire with itself.  Plaintiff alleges that Field, Nuzzo, and Mayor DeMaria acted to enforce City ordinances, albeit unlawfully. When these employees acted in the course of their employment, they acted on behalf of the City of Everett, and a conspiracy of one fails to state a claim.").  Each of the individual employees is identified as a Rinchem employee, and the Amended Complaint expressly states that Rinchem "is vicariously liable to plaintiff for the unlawful, discriminatory and retaliatory acts and inactions of their employees and agents *acting within the scope of their employment*."  See Docket # 30 at ¶ 19 (emphasis added).  This leaves only CGL, against which the Amended Complaint makes no specific allegations supportive of a claim for conspiracy, and in any event, faces the same hurdle as the individual defendants, since a company cannot conspire with its wholly-owned subsidiary.

See, e.g., U.S. ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 269 (D. Mass. 2015) (collecting cases).  Accordingly, I recommend dismissal of this claim.

Negligent Supervision

To prevail on a claim of negligent supervision, plaintiff must show "that (1) there was a duty or standard of care owed to him by [Rinchem]; (2) [Rinchem]'s conduct constituted a breach of such duty or violation of such standard of care; (3) the employees' conduct was the proximate cause of his harm; and (4) he suffered actual harm."  Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 368 (D. Mass. 2002) (citing Moylan v. Stop & Shop Cos., Inc., No. 99 Civ. 2140, 2001 WL 262661, at *2 (Mass. Super. March 14, 2001)).  Another element of such claims is that "during the course of employment, the employer becomes aware or should have been aware of problems with the employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment."  Jalbert v. Grautski, 554 F. Supp. 2d 57, 76 (D. Mass. 2008) (quoting Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 291, 526 N.E.2d 1309 (1988)).

Defendants assert two legal grounds for dismissal of this claim: (1) an employer's duty not to negligently supervise employees runs to the public, not to other employees; and (2) the claim is barred by the Workers' Compensation Act.  Plaintiff's oppositions do not substantively address either argument.  Defendants' second argument fails because although it is true that "[t]he Workers' Compensation Act precludes common law actions for both negligence and intentional torts that arise out of and in the course of employment," Grant, 183 F. Supp. 2d at 364-65 (quoting Doe v. Purity Supreme, Inc., 422 Mass. 563, 565, 664 N.E.2d 815, 818 (1996)) (internal quotation marks omitted), the exclusion only applies to damages considered "personal injuries" under the Workers' Compensation Act.  See, e.g., Johnson v. Amherst Nursing Home, Inc., No. 14 Civ.

30100, 2015 WL 4750932, at *9 (D. Mass. Aug. 11, 2015) (quoting Green v. Wyman-Gordon Co.,

664 N.E.2d 808, 813 (Mass. 1996).   The Act, however, expressly excludes the "mental or

emotional disability arising principally out of a bona fide, personnel action including a transfer,

promotion, demotion, or termination except such action which is the intentional infliction of

emotional harm."  M.G.L.A. c. 152 § 1 ¶ 7A.

Defendants' first argument, however, has merit.  Indeed, the sole case cited in this portion

of plaintiff's opposition provides that

> [t]he torts of negligent hiring, retention, and supervision ordinarily
> relate to situations where employees are brought into contact with
> members of the public in the course of an employer's business.
> Thus, the duty of an employer to avoid negligence in the hiring,
> supervision and retention of employees ordinarily runs to members
> of the public, and not to employees.

Vicarelli v. Bus. Int'l, Inc., 973 F. Supp. 241, 246 (D. Mass. 1997) (internal citations and quotation

marks omitted).  To this end, the majority of courts adopt an approach under which "the tort *is*

*limited* to violations of an employer's duty to protect the public at large from the misfeasance of

its employees."  See Hall v. FMR Corp., 559 F. Supp. 2d 120, 128 (D. Mass. 2008) (dismissing

negligent supervision claim brought by employee against employer) (emphasis added); see also

Choroszy v. Wentworth Inst. of Tech., 915 F. Supp. 446, 450 (D. Mass. 1996) (1996 case stating

that "this Court could locate no cases under Massachusetts law in this century in which any federal

or state court applied this tort to an employee's suit against his employer.").[23]  In any event, and

---

[23] Even those courts which do permit negligent supervision actions by an employee require "that the actions
of the negligently supervised or negligently retained supervisor be significantly more egregious than" those
complained of by plaintiff.  See Sabb v. S. Carolina State Univ., 350 S.C. 416, 431 (Pleicones, J., dissenting)
(collecting cases in which courts held that for employer to be liable for negligent supervision, employee
must have committed a tortious act resulting in plaintiff's injury).

particularly in light of plaintiff's failure to even address this issue, this point proves fatal plaintiff's negligent supervision claim, of which I recommend dismissal.[24]

Ninth Claim

Plaintiff's ninth claim sounds in promissory estoppel and breach of implied contract, the latter of which, as noted above, fails.  As to the former, a promissory estoppel plaintiff must allege that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise."  Carroll v. Xerox Corp., 294 F.3d 231, 242 (1st Cir. 2002) (quoting Loranger Const. Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 374 N.E.2d 306, 308 (1978)).  Further, under Massachusetts law, "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration."  Rhode Island Hosp. Trust Nat. Bank v. Varadian, 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995).  The instant claim centers on the notion that plaintiff reasonably relied, to his detriment, on defendants' representation "that you will not be fired if you tell the truth as required." See Docket #30 at ¶ 101.

Defendants attack plaintiff's estoppel claim by arguing that it fails to allege an actionable promise made by defendants to plaintiff.  I disagree.  Although plaintiff (inexplicably) fails to specify its source, the alleged representation upon which this claim is premised finds support in the Rinchem employee handbook, which states that "[a]ll reports [concerning workplace safety

---

[24] To the extent plaintiff may seek to impose liability upon defendants for their alleged breach of their duty to the public, the Amended Complaint belies such a theory, stating that "the breach of defendants' legal duty owed to plaintiff, the public, and other employees directly and proximately caused plaintiff's termination from employment and damages suffered."  See Docket # 30 at ¶ 97.  Plaintiff thus clearly seeks recovery in light of damages suffered by him, not the public.

issues] made in good faith can be made without fear of reprisal." Docket #36-1 at p. 11. Construing the allegations in the light most favorable to plaintiff, the Amended Complaint does, at bottom, sufficiently allege a promise upon which plaintiff reasonably relied to his detriment— *i.e.* it is plausible that plaintiff reasonably relied on the Rinchem handbook's assurance that good-faith reports of safety issues would not be met with reprisal, and ultimately suffered damages as a result. As such, I recommend that the portion of defendants' motions seeking dismissal of the portion of the ninth claim sounding in promissory estoppel be denied.[25]

Tenth Claim

Finally, plaintiff has brought a claim alleging that defendants' actions interfered with plaintiff's constitutional rights, thereby violating M.G.L. c. 12 §§ 11(h) and 11(i). Defendants seek dismissal of the § 11(h) claim on the ground that that subsection does not allow for a private right of action, instead permitting the attorney general to institute a civil action. See M.G.L. c. 12 §§ 11(h). Plaintiff's oppositions appear to concede this (accurate) point, and as such, plaintiff's § 11(h) claim should be dismissed.

The § 11(i) claim requires plaintiff to show that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Brown v. Sweeney, 526 F. Supp. 2d 126,

---

[25] I note that the handbook plainly is a Rinchem production, and as such, any promise deriving therefrom implicates Rinchem to a much larger degree than it does CGL, which is not mentioned once throughout the handbook. Plaintiff has alleged, however, that Rinchem and CGL are "related" and owned by the same individual, who serves both entities as President and Director. See Docket #30 at ¶ 17. Accordingly, plaintiff's promissory estoppel allegations, which reference, *inter alia*, "the course of the parties['] conduct, RCI and CGL training materials and applicable corporate compliance rules," see id. at ¶ 101, suffice for present purposes to support a claim against CGL. Of course, discovery may reveal that CGL made no promise sustainable of an estoppel claim, but dismissal on this ground at the 12(b)(6) stage would be improper.

134 (D. Mass. 2007) (citing Shaheed–Muhammad v. Dipaolo, 393 F. Supp. 2d 80, 93 (D. Mass. 2005)).  A "threat" is the intentional exertion of pressure to make someone fearful or apprehensive of injury or harm, "intimidation" means placing someone in fear for the purpose of compelling or deterring his or her conduct, and "coercion" is the application of physical or moral force to another to constrain him to do against his will something he would not otherwise do.  Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) (quoting Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474, 631 N.E.2d 985 (1994)).  Plaintiff alleges that defendants' threats of the consequences of reporting violations or speaking to Candelaria about defendants' purported misdeeds constitutes an infringement on plaintiff's First Amendment free speech rights. He further contends that he was "treated differently as a whistleblower" and deprived of due process and equal protection as required by the 14th Amendment.  See Docket #30 at ¶ 104.

Defendants argue that dismissal is warranted because plaintiff only alleges threats to his employment, which, as noted, was at-will.  See Docket #36-1.  Defendants' argument has merit; indeed, it is settled that threats of loss of at-will employment do not support a § 11(i) claim.  See, e.g., Webster v. Motorola, Inc., 418 Mass. 425, 430, 637 N.E.2d 203, 206 (1994); see also Nolan v. CN8, 656 F.3d 71, 77 (1st Cir. 2011) ("Although the Massachusetts Supreme Judicial Court has explicitly endorsed the view that purely economic pressures may constitute actionable coercion under the MCRA, it has held that the termination, or threatened termination, of at-will employees is not coercive in the relevant sense under the MCRA.") (citing Webster; Korb v. Raytheon Corp., 410 Mass. 581, 574 N.E.2d 370 (1991)) (internal citation omitted).

Accordingly, plaintiff's claim survives only if the Amended Complaint alleges some alternative form of threat, intimidation, or coercion.  However, each potentially relevant allegation throughout the Amended Complaint is tethered to defendants' alleged threats to plaintiff's at-will

employment.  See Docket #30 at ¶ 24 ("[P]laintiff objected and was threatened with termination . . . ."); ¶ 29 ("Plaintiff alleges he was unfairly and at the threat of termination coerced into signing an admission of responsibility . . . ."); ¶ 61 (Plaintiff "was threatened with his job."); ¶ 70 (defendants forced plaintiff "to sign a confession of responsibility at threatened risk of job loss"); ¶ 76 (defendants "threatened plaintiff with employment termination"); ¶ 79 (Boisvert threatened plaintiff that if he reported safety violations, he would lose his job); ¶ 89 ("[P]laintiff was threatened with job loss if he did not accept responsibility for alleged health and safety law violations committed by defendants[ ] . . . .").  Plaintiff's narrative is thus clear—he is seeking relief for defendants' alleged threats to his job.  As noted, however, because plaintiff was an at-will employee, such threats do not support a claim for relief under § 11(i).[26]

Plaintiff cites several cases in opposition, none of which is persuasive.  The courts in three of the cited matters actually dismissed their respective plaintiffs' § 11(i) claims.  See Meuser v. Fed. Express Corp., 564 F.3d 507, 519 (1st Cir. 2009) ("Meuser failed to establish that FedEx's actions, considered individually or together, constituted 'threats, intimidation or coercion' within the meaning of the MCRA."); Anjomi v. Kalai, 828 F. Supp. 2d 410, 413 (D. Mass. 2011) ("It's unclear how [defendant] interfered, threatened, intimidated, or coerced [plaintiff]."); Goddard v. Kelley, 629 F. Supp. 2d 115, 128-29 (D. Mass. 2009) ("[P]laintiff has not put forward any evidence that Manning even spoke to him, much less threatened, intimidated, or coerced him.").  The other cited cases, Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209 (1st Cir. 1989) and Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002) involved actions arising under 42 U.S.C. §§ 1983 and/or 1988, not § 11(i), rendering those matters inapposite.  Needless to say, this presentation falls far

---

[26] Plaintiff's assertion, made for the first time at oral argument, that Bell "felt threatened" by the prospect of having to reimburse the company in the event the diborane shipment was not accepted, finds no support in the Amended Complaint, and as such cannot salvage this claim.

short of compelling a departure from the conclusion set forth above, and indeed, plaintiff's failure to cite a single case supportive of his position speaks volumes about the paucity of this claim. Accordingly, I recommend that plaintiff's tenth claim be dismissed.

## **CONCLUSION**

In accordance with the foregoing, I recommend that the court enter an order allowing in part and denying in part defendants' motions (Docket # 31, 33, 35) as follows:

- Allowing Van Norman, Wilder, and Worthen's motion for dismissal[27] pursuant to Rule 12(b)(5);

- Allowing as to all moving defendants the motions for dismissal of Counts I, III, IV, VII, VIII, and X[28];

- Denying Rinchem's motion for dismissal of Count II;

- Allowing CGL's motion for dismissal of Count II;

- Allowing as to all moving defendants the motions for dismissal of the portion of Count VI sounding in Title VII;

- Allowing CGL, Brienholt, and Worthen's[29] motions for dismissal of the portion of Count VI sounding in § 151B;

- Denying Boisvert, Inman, Candelaria, Van Norman, and Wilder's[30] motions for dismissal of the portion of Count VI sounding in § 151B;

---

[27] Per Fed. R. Civ. P. 4(m), this dismissal should be without prejudice.

[28] As noted, the tenth claim referenced here is incorrectly labeled in the Amended Complaint as Count IX.

[29] See footnote 9, supra.

[30] See footnote 9, supra.

- Denying the motions for dismissal of the portion of Count IX sounding in promissory estoppel; and

- Allowing as to all moving defendants the motions for dismissal of the portion of Count IX sounding in breach of implied contract.

<u>/s/ David H. Hennessy</u>
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE